FILED
DALLAS COUNTY
3/31/2017 10:51:53 PM
FELICIA PITRE
DISTRICT CLERK

**Tonya Pointer**

CAUSE NO. **DC-17-03864** _____

| | | |
|---|---|---|
| SPIH TYLER, LLC., | § | IN THE DISTRICT COURT |
| _PLAINTIFF_ | § | |
| | § | |
| | § | |
| V. | § | |
| | § | |
| HARVEST CONSTRUCTION GENERAL | § | _____ JUDICIAL DISTRICT |
| CONTRACTING, INC., | § | |
| AMERICAN ZURICH INSURANCE CO., | § | |
| IMA OF KANSAS, INC., | § | |
| CONTINENTAL INSURANCE COMPANY, | § | |
| CONTINENTAL CASUALTY COMPANY, | § | |
| _DEFENDANTS._ | § | DALLAS COUNTY, TEXAS |

## ORIGINAL PETITION

Plaintiff SPIH Tyler, LLC, complains of Defendants Harvest Construction General Contracting, Inc., American Zurich Insurance Company, IMA of Kansas, Inc., Continental Insurance Company and Continental Casualty Company and respectfully shows the following:

### I.
### DISCOVERY CONTROL PLAN

Pursuant to Rule 190.3 of the Texas Rules of Civil Procedure, Plaintiff elects Discovery Control Plan 3.

### II.
### PARTIES, JURISDICTION & VENUE

1. Plaintiff, SPIH Tyler, LLC,  is a Texas Limited Liability Co. with its principal office in  Dallas County, Texas.

2. Defendant, Harvest Construction General Contracting, Inc. is a corporation doing business in Texas that can be served by serving its president Matt Mabe, at its

---

EXHIBIT C

home office, 849 S. Sumac Dr. Gardner, Kansas 66030 by certified U.S. mail, return receipt requested.

3.  Defendant **American Zurich Insurance Company** issued Plaintiff Policy # ECN 436s6470  and opened Claim #: 5570t44327.  American Zurich Insurance Company may be served by serving its registered agent, Corporation Service Company, at 211 E 7th St., Suite 620,  Austin, Travis County, Texas78701 -3218.

4.  Defendant **IMA of Kansas, Inc.**, is a Kansas-based  insurance  agency  doing business in Texas and may be served  by serving its president, Bob Reiter, at its home office at 51 Corporate Woods,  9393 W. 110th Street, Suite 600 Overland Park, Kansas 66210, by certified U.S. mail, return receipt requested.

5.  Defendant **Continental Insurance Company**, is an insurance company doing business in Texas and may be served by serving its registered agent, C T Corporation System, at 1999 Bryan Street,  Suite 900, Dallas, Dallas County, Texas 75201 -3136.

6.  Defendant **Continental Casualty Company**, also called Continental Casualty Company Inc. and CNA Insurance is an insurance company doing business in Texas and may be served by serving its registered agent, C T Corporation System, at 1999 Bryan Street,  Suite 900, Dallas, Dallas County, Texas 75201 -3136.

7.  This Court has subject matter jurisdiction over this controversy because the amount at issue exceeds the minimal jurisdictional limit of the Court. Venue is proper in Dallas County, Texas, because the contract was entered into in Dallas County.

EXHIBIT C

### III.
### SUMMARY OF CLAIMS

8.  The construction and operation of the Value Place Hotel (the "Hotel") was insured at every stage by Defendant Insurance companies offering turnkey contractual coverage and group policies for the contractor, the franchise and the individual franchise location.  Following the discovery of defective design and construction of the hotel, Plaintiff made claim upon the various insurance carriers for coverage.  Each claim was refused,  denied or ignored.

9.  Defendant, Harvest Construction General Contracting, Inc. work was defective and negligent, and the Insurance Company Defendants engaged in acts and omissions constituting "unfair claims settlement practices" , including one or more of the following:

•  Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

•  Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies

•  Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

•  Refusing to pay claims without conducting a reasonable investigation based upon all available information;

•  Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;

•  Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

EXHIBIT C

• Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds;

• Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application;

• Attempting to settle claims on the basis of an application which was altered without notice to, or knowledge or consent of the insured;

• Making claims payments to insured or beneficiaries not accompanied by a statement setting forth the coverage under which payments are being made;

• Making known to insured or claimants a policy of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements of compromises less than the amount awarded in arbitration

• Delaying the investigation or payment of claims by requiring that an insured or claimant, or the physician of either, submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information;

• Failing to settle claims promptly, where liability has become reasonably clear, under one portion of the insurance policy, coverage in order to influence settlements under other portions of the insurance policy coverage; or

• Failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

IV.

### FACTUAL BACKGROUND

10. Defendant Harvest Construction General Cont. Inc. of Olathe Kansas, working off of plans and design drawn by Howard+Helmer Architects, P.A. of Overland, Kansas constructed the Tyler Value Place [Architects Project No. 07235.00] beginning in 2007

EXHIBIT C

and finished in 2008. Design deficiencies and construction defects have caused the extensive damages to the Hotel and Plaintiff.  The resulting damages have required the removal and replacement of the exterior cladding of the entire structure at a cost of almost half of the original construction cost.  Howard+Helmer failed to design the hotel with  "Exterior walls that provide the building with a weather-resistant wall envelope as required by  Int'l Bldg Code § 1405.2 (Int'l Code Council 10th ed. 2003).   Harvest failed to construct the hotel with a water resistant wall envelope, roof system, flashing and were negligent in numerous aspects of the construction.

11.  On or about July 16, 2007 the Plaintiff entered into a A.I.A Document 8151'" - 1997 Abbreviated Standard Form of Agreement Between Owner and Architect wherein Howard+Helmer is identified as the Architect and SPIH Tyler, LLC is identified as the Architect's "Client" and as the "Owner".   A separate AIA Document A101-1997 Standard Form of Agreement Between Owner and Contractor was entered into between Harvest and Plaintiff to build the Tyler Value Place Hotel according to the plans and construction documents prepared by Howard+Helmer specifically for Plaintiff.   The Tyler Value Place Hotel is an approximately 42,640 sq. ft, this four-story extended stay hotel is comprised of 124 units of either one or two bed studio rooms, with kitchen area in rooms with on-site laundry facilities.

12. As required by the Construction Documents, Defendant Harvest Construction procured an occurrence General Commercial Liability (a "GCL") policy in the amount of $2,000,000 from Defendants continental insurance company Policy C2089103966 and Defendants continental insurance company Policy C2090347944 through Defendant IMA

---

EXHIBIT C

of Kansas, Inc. The Certificate (Accord form 25-S) dated Nov. 16, 2007 bound CGL coverage for policy periods to cover the duration of construction.  The effective date of the policies was for 03/09/2007 to 03/09/2008.  Plaintiff is the Certificate Holder, and was also a named additional insured on both policies.  Plaintiff brings suit as a first party insured seeking property damage done to the Tyler Value Place resulting from construction defects. The Defendants Continental Casualty and Continental Insurance will be collectively referred to as Continental unless separate identification is necessary.

13. On or about January 2016 Plaintiff gave notice of claim against to defendants IMA, continental insurance company, American Zurich Insurance Company and Continental Casualty Co. of the occurrence of property damage arising from construction defects. Each wholly failed to investigate the claims, adjust the claims and comply with the requirements of the Texas Insurance Code and engaged in deceptive trade practices.

14. The CGL policies provides that the insurance carrier "will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies and will "defend the insured against any suit" seeking those damages.  The policy further provides that insurance applies to "bodily injury" or "property damage" only if the "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the coverage territory.  The occurrence here are deliberate acts, performed negligently, which are an accident as the effect is not the intended or expected result, that is, the result would have been difference had the deliberate act been performed correctly.  The property damage described herein are the result of undiscovered accidents, and acts not performed properly during the course of

EXHIBIT C

construction. The accidents resulted in serious property damage, including loss of use of portions of the property.

15. These two AIA construction documents, integrate the construction drawings, plans and other design documents, which collectively will be referred to as the Construction Contract, executed in Dallas Texas by Plaintiff and Harvest which the defendant Howard+Helmer agreed to design and Harvest agreed to act as a General Contractor and construct the "Value Place Hotel at 3210 S. Southwest Loop 323 Tyler Texas, according to a definite scope of work pursuant to an approved schedule.

16. Howard+Helmer Architecture is a full-service architectural firm offering a complete range of services from Master Planning, all the way through project completion. The firm markets itself as "believing in going the extra mile with a client-oriented attitude of service and with a commitment to develop each project to its maximum potential." Howard+Helmer were retained because of their experience in the design of hospitality projects, specifically the Value Place hotel chain, having designed hotels for 15 franchisees' in approximately 30 states providing site investigations, pre-design architectural site adaptations, and construction document services for this extended stay hotel concept and to create prototype upgrade drawings for franchisor, Value Place, LLC. The wood-frame building was usually designed with a cement board lap-siding and composite shingle sloped roof with Gable vents and bump-outs help create a more aesthetic appeal. Departing from their usual design, Howard+Helmer designed the Tyler Value Place using stucco and synthetic stone exterior cladding. Their design was negligent and Howard+Helmer failed to adhere to the manufacturer's recommended

EXHIBIT C

installation instructions and generally accepted building practices and the Int'l Bldg. Code § 1405.2 (Int'l Code Council 10th ed. 2003).

17. Defendant Harvest Construction General Cont. Inc. of Olathe Kansas, working off of plans and design drawn by defendant Howard+Helmer Architects, P.A. of Overland, Kansas constructed the Tyler Value Inn [Architects Project No. 07235.00] beginning in 2007 and finished in 2008.

18. The stone cladding and stucco design by Howard+Helmer specified a sole source stone provider, Lone Star Stone, Inc. (with no substitutions allowed). The stone used was manufactured stone, a product known as Ledgestone veneer (Veneer types as shown on drawings).[1] Manufactured Stone Veneer is a product that has the appearance of natural stone, but is manufactured with concrete. The material itself is porous, the no grout installation method (just stacked open fit, adhered to the Tyvek with cement which leave open paths, channels and gaps that allow ready water penetration necessitating an adequate water barrier to protect the OSB sheathing, insulation and framing and interior drywall.

19. Problems using Manufactured-Stone was known in the construction trade for years before the Tyler project. The need for proper flashing, two layers of heavy duty building paper and weep holes to keep wall from getting wet, if not the use of an air gap or drainage wall system. See Manufactured-Stone Nightmares, Journal of Light Construction, December 2004.

---

[1] Color: Cordova. Headerstone (Trim and Accessory types as shown on drawings.) Color: Maple

EXHIBIT C

20. The IBC standard WRB material can be defined as ASTM D-266 Type I asphalt-saturated felt or alternate material with equal or better ability to prevent water penetration. Howard+Helmer had no ASTM standard to evaluate the equivalency of Tyvek to the asphalt-saturated felt in water resistance performance, having no stated criteria to assess water performance equivalency of Tyvek or to compare them with the code-specified D-266 Type I asphalt-saturated felt.

21. The apparent dead-end in WRB penetration performance criteria is addressed by a document entitled,  Acceptance Criteria for Water-Resistive Barriers, also known as AC38, which is published by the same organization that publishes the IBC (International Code Council, Inc., also known as ICC). Although this document is not directly referenced by the code, its stated purpose is "to establish requirements for recognition of water-resistive barriers in ICC Evaluation Service, Inc. evaluation reports under the 2003 International Building Code (IBC), the 2003 International Residential Code (IRC), the 1999 BOCA National Building Code (BNBC), the 1999 Standard Building Code (SBC), and the 1997 Uniform Building Code (UBC)."

22. AC38 groups WRB materials into three categories: paper-based, felt-based, and polymeric-based barriers. Felt-based WRBs are defined as "asphalt-saturated organic felts that comply with ASTM D-226 and are intended for use as water-resistive barriers." This definition is the same as that provided by the ICB and offers no additional information regarding water resistance performance. Water resistance test data are not included in the information required to be submitted for approval of felt-based materials as WRBs.

EXHIBIT C

23.   The choice of Tyvek as a sole and single layer barrier invited further problems. The manufactured stone, exposed to the sun, turns trapped water into steam and vapor, which penetrates through the  "micro-perforations," or thousands of holes in the Tyvek, which by design,  allow the building to breathe.  Howard+Helmer failed to consider the water intrusion problems well known in the industry, including capillary suction, surface tension, and the real world moisture transport mechanism that affect the in-service performance of WRBs.  See <u>Interf. Age</u> November 2005.

24. The manufacturer, Lone Star Stone provided its own installation instructions, which included a specification of a water resistant barrier, ASTM D 226 No. 15 non-perforated asphalt-saturated organic felt) (UBC Standard l4-1 kraft waterproof building paper) otherwise known as 15 lb. felt or tar paper.  Howard+Helmer cut and pasted this instruction into its project manual, but despite this specific instruction, Howard+Helmer specified the Tyvek wrap in the building plans and drawings.  **Tyvek is a breathable weather barrier, not a water resistant barrier.**  Tyvek is a unique material science helps prevent the infiltration of air and water, but allows water vapor escape (and enter) to prevent rot and mold inside walls.  Howard+Helmer made specific directions on the type of stone, its physical characteristics and method of installations, and particularly the moisture barrier to be used with the stone product, to wit:  "Material: Veneer Units: Pre-cast veneer units consisting of Portland cement, sand, lightweight aggregates, and mineral oxide pigments.

   1. Physical Properties:
   a. Compressive Strength: ASTM C 513, 5 sample ave.........2,200psi(15 MPa)
   b. ShearTest: ASTM C 482,............. ............50 psi (335 kPa)

EXHIBIT C

c. Water Absorption: UBC Standard 32-12,........... ...22percent
d. Freeze-ThawTest: ASTM C67,............ ...........0.óT percent
e. Thermal Resistance: ASTM C 177.............. .....RO.óO(0.11)

f. Density: ASTMC567(Dry density)………………….75pcf(l200kgper m3)

Moisture Barrier: (ASTM D 226 No. 15 non-perforated asphalt-saturated organic felt) (UBC Standard l4-1 kraft waterproof building paper)

NOTE: This is not what compliant with what would become the industry standard, which calls for two layers of Moisture Barrier. A standard developed after known failures of Tyvek. With just one layer specified, Tyvek would not have been an acceptable alternative to 15LB felt. Not suggesting that one layer of anything is an acceptable substitute to the specified two layers of WRB.

Reinforcing: (ASTM C 847 galvanized expanded metal lath) (ASTM C 847 painted expanded metal lath) (l inch galvanized steel, 18 gauge woven wire mesh) complying with code agency requirements for the type of substrate over which stone veneer is installed.
Mortar:
l. Cement: Any cement complying with ASTM C 270.
2. Lime: ASTM C 207.
3. Sand: ASTM C l44, natural or manufactured sand.
4. Pigment: ASTM C979,mineral oxide pigments'
5. Water: Potable.
6. Pre-Packaged Latex-Portland Cement Mortar: ANSI A1 18.4'
Bonding Agent; Daraweld C as manufactured by Grace Construction, or equal Products.1
Sealer: 'Water based silane or siloxane masonry sealer, clear or semigloss finish
per            owners approval.

INSTALLATION:

1. Install and clean stone in accordance with manufacturer's installation instructions for            Standard Grouted Joint installation.
2. Apply sealer in accordance with sealer manufacturer's installation instructions.

25. DuPont™ Tyvek® HomeWrap® is the original house wrap, incorporating unique

material science that helps keep air and water out, while letting water vapor escape. As a

result, it can contribute to improved building durability by helping to protect homes

EXHIBIT C

against damaging wind and rain that can penetrate the exterior cladding.   Tyvek®
HomeWrap® can also reduce home energy bills by controlling air flow and water
intrusion, which helps insulation work better, allowing the HVAC system to work more
efficiently.  It's a house wrap engineered to keep homes cool in the summer, warm in the
winter, and dry all year round (when combined with an effective exterior cladding such
as Hardi-Board).

26. The unique nonwoven structure of Tyvek® HomeWrap® makes it breathable,
allowing moisture vapor to pass through. This helps promote drying in wall systems, to
help prevent mold and water damage, but is not meant to be the sole barrier from the
elements.  It lets ambient moisture vapor back into the structure.  Through a combination
of water sources directly entering the manufactured stone cladding, some directed onto
the stone by a defective guttering system, others trapped by exterior penetrations such as
the HVAC units, water and water vapor began to soak the OSB board, then the insulation,
the wooden framing, then revealing itself through the interior drywall.  By the time the
moisture was detected from the interior, the exterior damage was done.

27. Tyvek® HomeWrap® is a perforated wrap. Perforated house wraps require
"micro-perforations," or thousands of holes, to allow the product to breathe. While this
can help keep moisture from getting trapped inside walls, it also gives water and air a
way in. Perforated wraps give up a great deal of resistance to air and water penetration in
order to achieve some level of vapor permeability. Water and air infiltration can lead to
the potential for water damage and make insulation less effective, leading to higher
energy costs.

EXHIBIT C

28. The National Concrete Masonry Association (the "NCMA") is the national trade association representing the producers and suppliers of concrete masonry products, including concrete block, manufactured stone veneer didn't publish WRB instructions until 2009.

## V.
## DISCOVERY OF THE WALL SYSTEM FAILURE

29. Plaintiff retained Exterior Consulting Innovations, Inc. (ECI) to conduct an investigation of the water penetrations (leaks) found in the exterior walls at the Value Place Hotel - Tyler and to supervise the repairs.  On Tuesday, November 10, 2015, ECI visited the site to conduct a visual assessment of the reported water intrusion issues present in the facility. During this visit, ECI interviewed site personnel associated with the facility, reviewed available documentation and visually inspected the facility. Interior finishes (drywall) had been previously removed from exterior walls at several of the units. This allowed ECI to inspect and document types, locations and the severity of the water migration into the wall system. ECI reviewed the construction specifications and the construction drawings provided. The specifications require one layer of weather barrier similar to Tyvek Commercial Wrap in three different specification sections, Rough Carpentry Section, Sheathing Section and Siding Section. There were no specifications for the dry set fieldstone and the drawings do not have details for this installation

30. ECI returned to commence destructive testing in February 2016 which involved opening up the wall cavity.  The scope of work evolved into the "Worst Case Scenario"

EXHIBIT C

necessitating the removal of the entire exterior cladding of stone and stucco, replacement of significant portions of the exterior sheathing and some structural studs, and inside of the exterior walls had been saturated for an extended period of time, causing rot in the building studs and extreme deterioration of the Oriented Strand Board ("OSB"), the particle board that once served to support and stabilize the studs.  ECI concluded the water intrusion was caused by multiple design failures, failure to follow building code standards as well as site-specific building standards and failure to construct the water resistant barrier, the ("WRB").

31. Their investigation revealed water damage to the walls of the structure, caused by the improper design and installation of the stone and stucco system, which had compromised the load-bearing functions of the structure to the extent that the structure had become unsafe. Additionally, the water intrusion had created unsanitary conditions allowing mold, mildew, and insect infestations to thrive.

32. The Manufactured Stone Veneer was added to the design plans by Addendum Number 7.   The Moisture Barrier specified in Section 04730 – Manufactured Stone Veneer is UBC Standard 14-1 Kraft Waterproof Building Paper (ASTM D 226 No. 15 **non-perforated** asphalt saturated organic felt). There are exposed areas where the OSB sheathing has deteriorated and the weather barrier is visible from the interior. ECI verified that there is one layer of weather barrier installed over the sheathing. Sections of the weather barrier were turned into the rough openings around the windows, which were labeled with Tyvek information; therefore, a Tyvek weather barrier product was utilized on the project behind the stone. The Tyvek Building Wrap was installed in lieu of 15#

EXHIBIT C

felts.  When the designed was changed from Hardi-board to Stone, the   WRB   was   not changed, and the Tyvek was deficient as a WRB.  The design failures include failure to follow The International Building Code, which contains the following requirement: "Exterior walls shall provide the building with a weather-resistant wall envelope." Int'l Bldg Code § 1405.2 (Int'l Code Council 10th ed. 2003).

33. The Tyvek paper "be applied horizontally with upper layers overlapping the lower layers by no less than two inches" before the application of the stucco. Significantly, when ECI cut into the exterior walls of the structure, they discovered the Tyvek paper had been lapped around the wall in reverse, channeling water toward the OSB and building studs rather than repelling it away from the structure. Furthermore, the Tyvek paper had been wrapped to the inside of the structure's flashing materials, encouraging rather than preventing water intrusion.

# VI.
## DEFECTIVE ROOF, GUTTER
### AND
## DRAINAGE DESIGN AND CONSTRUCTION

34. Another major design and construction defect concerned the structure's roof and gutter system.  Certain portions of the roof were not designed with gutters and rain water was directed onto the wall system, further aggravating the water penetrations.  Rain gutters properly installed along the edge of a roof can help prevent water damage to a building and its landscape and hardscape in several important ways. The primary function

EXHIBIT C

of a roof guttering system is to direct water from the roof of a home or building to the ground in such a way that it does not damage or run down the outer walls of the building causing damage to the building or environs. As the roof was designed and lacking adequate guttering, water was directed onto the building and air conditioning units where the damage became more evident when the stone cladding was removed.

35. Another major defect concerned the structure's flashings. ECI found the flashings installed around the windows and doors were inadequate. Below exterior doors, pan flashings should have been installed to collect and drain water away from the building. However, ECI determined that these flashings were improperly installed resulting in water damage that penetrated the subfloor, causing swelling of the subfloor and eventual damage to carpets. Above doors and windows, lack of adequate head flashings resulted in such significant water damage to the trim of the structure that one door casing was so saturated ECI could not even take a moisture meter reading. Instead, to demonstrate the extent of the decay, he sunk the entire metal length of his car key into the door casing with almost no effort and took a photograph.

36. Other major structural defects discovered include: inadequate kick out flashing where the wall system met the roof and a lack of maintainable caulk joints where the stucco wall met the brick allowing water penetration as the different materials expanded unequally. All four exterior load-bearing walls suffered considerable water intrusion, resulting in saturated and rotting OSB, rotting studs, and soaked insulation. Major elements of restoration of the structure will include tearing off all of the stone, stucco and Tyvek paper, removing all of the OSB, temporarily jacking and securing the property,

EXHIBIT C

replacing decaying building studs, and reconstructing parts of all four exterior load-bearing walls.

a. The stucco and stone exterior of the structure was not properly applied over an adequate WRB and was not sealed, allowing water to come into contact with the walls and accumulate between the stucco and the walls;

b. This water accumulation over time caused the OSB plywood walls nailed to the studs on the first floor to rot away. The OSB plywood serves a structural purpose by holding the structure supporting studs together. This constitutes actual physical damage;

c. This water accumulation has also caused the load bearing studs themselves to begin to rot and will slowly over time, cause them to rot;

d. This water accumulation also cause[d] the frames to rot, so that the front door frame was so softened that a key could be sunk in the transom over the door.

e. These conditions were due to lack of an adequate water barrier and non-compliance with building standards.

f. These conditions were not caused by nail holes, screw holes, the roof, lack of proper maintenance, or hurricanes.

g.   The exterior of the structure is 60% manufactured stone and 40% stucco.

37. Based on these findings, ECI concluded that "major structural defect" existed and evidence of defects in design and workmanship.

## VII.
## CAUSES OF ACTION

## COUNT 1:
## BREACH OF CONTRACT
## AGAINST  HARVEST  CONSTRUCTION  GENERAL  CONTRACTING, INC.

38. All factual allegations set forth elsewhere in this petition are incorporated by

EXHIBIT C

reference as if specifically alleged herein and in support of this cause of action.

39. Defendant breached the  terms and conditions of the AIA Document A 101-197; A201 - 1997 and Project Manual General Condition of the Contract for Construction. The breach is material because Defendant has failed to perform material obligation required pursuant the agreement. The failure to supervise, remediate defects, complete punch list items and to properly construct the wall system greatly contribute to significant operating problems and a lack of confidence in the completed work. Certain defects and defective plumbing items were immediately known to Plaintiff and remedied during the punch list phase of the construction. The defects and deficiencies in the construction of the wall system was concealed within structure and not known until ECI began  its destructive investigation of the wall system, and the extent of which was not known until the entire wall system was removed.

40. Plaintiff has been and will continue to be injured by this breach, by the delays and loss of complete use of the structure as intended and by the expected damage and interference by continued leaks in the premises. The damages are a natural and probable cause of these breaches in that they directly flow from the failure of Defendant to fulfill its obligations under the construction contract.

EXHIBIT C

## COUNT 2
## BREACH OF CONTRACT
## CONTINENTAL INSURANCE COMPANY, CONTINENTAL CASUALTY COMPANY
## AND
## AMERICAN ZURICH INSURANCE CO.

41. All factual allegations set forth elsewhere in this petition are incorporated by reference as if specifically alleged herein and in support of this cause of action.

42. Each defendant insurance company breached their contract of insurance with Plaintiff, and further violated the Texas Insurance Code by one or more of the following acts, and wholly failed to investigate the claims, adjust the claims and comply the requirements of the Texas Insurance Code.

43. The CGL policies provides that the insurance carrier "will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies and will "defend the insured against any suit" seeking those damages. The policy further provides that insurance applies to "bodily injury" or "property damage" only if the "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the coverage territory. The occurrence here are deliberate acts, performed negligently, which are an accident as the effect is not the intended or expected result, that is, the result would have been difference had the deliberate act been performed correctly. The property damage described herein are the result of undiscovered accidents, and acts not performed properly during the course of construction. The accidents resulted in serious property damage, including loss of use

EXHIBIT C

of portions of the property.

## COUNT 3:
## BREACH OF WARRANTY - EXPRESS & IMPLIED AGAINST HARVEST CONSTRUCTION GENERAL CONTRACTING, INC.

44. Plaintiff, SPIH Tyler, incorporates the foregoing paragraphs by reference as though fully set forth herein.

45. The Defendant expressly warranted in writing that the Defendant would do the work required by the contract in a good and workmanlike manner, but the Defendant breached that warranty in that Defendant failed to properly install the exterior cladding, the exterior water proof barrier, flashing, seams and window systems, the gutter system and the roofing system, with more defective work in the plumbing systems and other punch-list items. The reasonable estimated cost of rectifying the defects in the defendant's performance is $ $1,550,000.00. In addition, as a result of the leaky plumbing, the interior walls, and ceilings, the building was and is damaged by water, necessitating resurfacing the entire cladding of the stone and stucco finish, as well as damage done to the OSB board exterior and insulation, drywall, walls and ceiling. Further the electrical system is also being affected by the repeated water instruction from faulty plumbing thereby cause a potentially dangerous situation to health, safety and welfare of the occupants. 18.Also, the plumbing system is showing effects of

EXHIBIT C

defects to the construction and installation by repeated leaks and failure to perform as a system as designed. The true extent of the defects is unknown until more intrusive testing and evaluations are conducted.

## COUNT 3.
## NEGLIGENCE AGAINST HARVEST CONSTRUCTION GENERAL CONTRACTING, INC.

46. Plaintiff, SPIH Tyler, incorporates the foregoing paragraphs by reference as though fully set forth herein.

47. The Defendants breached their duty of ordinary care in evaluating, preparing, conducting and completing the construction and then the repairs in question. Defendant had the following common-law duties to Plaintiff:

a. The duty to prevent injury to Plaintiff if it reasonably appears or should appear that in the exercise of Plaintiffs ' lawful rights, Plaintiff or others may be injured by a dangerous or non- compliant condition that was created by Defendant;

b. The duty to exercise reasonable care to avoid a foreseeable risk of damage to Plaintiff;

c. The duty to take affirmative action to control or avoid increasing the cost and economic injury from conduct which Defendant has at least partially created;

d. The duty to use ordinary care in aiding or protecting Plaintiff from economic peril when the peril is under the control of Defendant;

e. The duty to use ordinary care in making representations and in ascertaining the accuracy of information given to Plaintiff and other parties whom had discretionary control over Plaintiff s foreseeable need to utilize  a properly completed property construction;

f. The duty to exercise reasonable care in performing services, whether

EXHIBIT C

gratuitously or for consideration, that Defendant should recognize as necessary for protection of other persons or things;

    g. The duty to exercise reasonable care in performing services for another, whether gratuitously or for consideration, that Defendant should recognize as necessary for the protection of Plaintiff or Plaintiff s property; and

    h. The duty to use reasonable care when referring others in connection with services to Plaintiff.

48. Defendant breached its various duties owed to Plaintiff by failing to, among others, to do the following:

    a. In failing to act as a person of ordinary prudence would have acted under the same or similar circumstances in carrying out these duties, Defendant was negligent ;

    b. In not completing its scope of work on agreed time table and m the actual performance of its services;

    c. In failing to properly construct in accordance with the information provided; In failing to properly supervise sub-contractors;

    d. In failing to properly make timely and proper repairs or recondition of deficient work;

    e. In failing to properly remediate defective plumbing installations or the lack there of;

49.  In failing to act as a person of ordinary prudence would have acted under the same or similar circumstances in carrying out these duties, Defendant was negligent. This negligence proximately caused property damage, economic loss and loss of use and enjoyment of property to Plaintiff, for which it now sues

50. Defendant's acts or omissions as alleged herein, when viewed objectively from

EXHIBIT C

the standpoint of the actor at the time of their occurrence involved an extreme degree of

risk, considering the probability and magnitude of the potential harm to others.

Defendant had actual, subjective awareness of the risk involved, but nevertheless

preceded with conscious indifference to the rights, safety, or welfare of others.

Consequently, Plaintiff is entitled to recover exemplary damages under Chapter 41 of

the Civil Practice and Remedies   Code.

## COUNT 4
### DECEPTIVE TRADE  PRACTICES ACT VIOLATIONS
### AGAINST CONTINENTAL INSURANCE COMPANY CONTINENTAL
### CASUALTY  COMPANY AND AMERICAN ZURICH INSURANCE CO.

51.   Plaintiff, SPIH Tyler, incorporates the foregoing paragraphs by reference as

though fully set forth herein.

52. In addition to the foregoing, Harvest, Continental Insurance Company,

Continental Casualty Company,  and American Zurich Insurance Co. actions constitute

the following false, misleading, or deceptive acts or practices under sec 17.46(b) of the

DTPA:

> (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have.

> (6) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

EXHIBIT C

## COUNT 5:
## BREACH OF CONTRACT AGAINST CONTINENTAL AND  IMA

53. Plaintiff, SPIH Tyler, incorporates the foregoing paragraphs by reference as though fully set forth herein. Continental has breached virtually all of its contractual obligations to Plaintiff including at least the following provisions:

54. Continental's failure to objectively investigate Plaintiffs' claim, and its total abdication of that duty to Defendant IMA, constitutes a separate breach of contract, as did Continental's failure to pay Plaintiffs' claim in accordance with the Loss Payment provision of the policy of insurance.

55.   Each of Continental's breaches, separately and in conjunction, proximately caused damage to Plaintiffs for which they now sue.

56.   Plaintiffs have made written demand upon Continental, which demand was refused.

57. Consequently, she is entitled to recover her reasonable attorneys' fees pursuant to Chapter 38 of the Civil Practice and Remedies Code.

58.   Plaintiffs further seek to recover the 18% penalty on the amount due on her claim under the insurance policy pursuant to Article 21.55, § 6.

## COUNT 6:
## ARTICLE 21.21 VIOLATIONS AGAINST CONTINENTAL, ZURICH
## AND IMA

59.   Plaintiff, SPIH Tyler, incorporates the foregoing paragraphs by reference as though fully set forth herein. Defendants Continentals' and IMA' actions violate Texas

EXHIBIT C

Insurance Code Article 21.21, § 4(10)(a)(i)(ii)(iii)(iv)(v) & (viii) in that they involve:

- misrepresenting to a claimant a material fact or policy provision relating to coverage at issue;

- failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the insurer's liability has become reasonably clear;

- failing to attempt, in good faith, to effectuate a prompt, fair, and equitable settlement under one portion of a policy of a claim with respect to which the insurer's liability has become reasonably clear in order to influence the claimant to settle an additional claim under another portion of the coverage, provided that this prohibition does not apply if payment under one portion of the coverage constitutes evidence of liability under another portion of the policy;

- failing to provide promptly to a policyholder a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for the insurer's denial of a claim or for the offer of a compromise settlement of a claim;
- failing within a reasonable time to affirm or deny coverage of a claim to a policyholder or submit a reservation of rights to a policyholder;

- refusing to pay a claim without conducting a reasonable investigation with respect to the claim.

- In addition, Defendants, by their acts and omissions referenced above, violated § 17.46(b)(2), (3), (5), (7), (12) and (24) of the DTPA, each of which violation is actionable under Article 21.21, § 16(a).

- Defendant IMA' actions and omissions as an adjuster also fall under Article 21.21.

60. Defendants' violations of Article 21.21 were a producing cause of Plaintiffs' actual damages, including mental anguish, court costs, and reasonable and necessary attorneys' fees, for which it now sues.

61. Defendants' acts and omissions as summarized above were committed

EXHIBIT C

knowingly and intentionally. Plaintiffs, therefore, seek to recover treble damages under Article 21.21, §16(b), as well.

62. Plaintiffs further seek to recover the 18% penalty on the amount due on her claim under the insurance policy pursuant to Article 21.55, § 6.

## COUNT 7:
## ARTICLE 21.55 VIOLATIONS AGAINST CONTINENTAL

63. Defendant Continental violated Texas Insurance Code Article 21.55, the Prompt Payment of Claims Act, by failing to timely acknowledge receipt of Plaintiff's claim, commence an investigation of that claim, and request any additional information necessary to process that claim.

64. Defendant Continental further violated Texas Insurance Code Article 21.55 by failing to timely notify Plaintiff in writing of the acceptance or rejection of her claim, by failing to  notify her in writing of the reasons for rejecting the portions of her claim that Continental effectively denied, and by failing to notify Plaintiff in writing that Continental would be unable  to comply with the time requirements of the Act.

65. Defendant Continental further violated Texas Insurance Code Article 21.55 by failing to timely pay Plaintiff those portions of her claim that Continental agreed to pay.

66. Defendant Continental's violations of Article 21.55, individually or collectively,

EXHIBIT C

were a producing cause of Plaintiffs' actual damages, including mental anguish, court costs, and reasonable and necessary attorneys' fees, for which she now sues.

67. Defendants' acts and omissions as summarized above were committed knowingly and intentionally. Plaintiff, therefore, seeks to recover treble damages under Article 21.21, §16(b), as well.

68. Plaintiffs further seek to recover the 18% penalty on the amount due on her claim under the insurance policy pursuant to Article 21.55, § 6.

<h3 align="center">COUNT 8:<br>NEGLIGENCE PER SE</h3>

69. Defendants Continental and IMA, directly or through their authorized agents, representatives and employees, by the acts and omissions summarized above, violated Sections 28.03, 28.04, and 22.04 of the Texas Penal Code. By the acts and omissions summarized above, Defendants knowingly and intentionally endangered the health, safety and welfare of Plaintiff and her minor children. Such conduct constitutes negligence *per se* and has proximately caused damage to Plaintiff for which she now sues.

70. Pursuant to Article 21.21, Defendant Continental and IMA owe a statutory duty to Plaintiffs as set forth above. Defendants Continental and IMA breached that duty in their overall handling of Plaintiff's claim; in their misclassification of the

EXHIBIT C

claim; by providing improper remediation instructions; by refusing to acknowledge the risks and remedies of Plaintiffs' mold contamination; by refusing to make a reasonable and proper settlement of Plaintiffs' claims when Defendants knew or should have known the actual risks to which Plaintiffs were exposed; for failing and refusing to properly adjust the claim when there was no reasonable basis  for inadequate adjustment and by refusing, failing, or neglecting to pay benefits due within a reasonable time. Defendants' breach of that duty proximately caused damages to Plaintiffs for which they now sue.

**COUNT 9**
**UNFAIR CLAIMS SETTLEMENT PRACTICES**
**AGAINST CONTINENTAL INSURANCE COMPANY**
**CONTINENTAL CASUALTY  COMPANY**
**AND AMERICAN ZURICH INSURANCE CO.**

71. Plaintiff, SPIH Tyler, incorporates the foregoing paragraphs by reference as though fully set forth herein. The insurance company defendants engaged in one or more of the following unfair claims settlement practices, including:

❖ Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

❖ Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

❖ Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies

❖ Refusing to pay claims without conducting a reasonable investigation based

EXHIBIT C

upon all available information;

✦ Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;

✦ Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

✦ Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds;

✦ Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application;

✦ Attempting to settle claims on the basis of an application which was altered without notice to, or knowledge or consent of the insured;

✦ Making claims payments to insured or beneficiaries not accompanied by a statement setting forth the coverage under which payments are being made;

✦ Making known to insured or claimants a policy of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements of compromises less than the amount awarded in arbitration;

✦ Delaying the investigation or payment of claims by requiring that an insured or claimant, or the physician of either, submit a preliminary claim report and then requiring the subsequent sub- mission of formal proof of loss forms, both of which submissions contain substantially the same information;

✦ Failing to settle claims promptly, where liability has become reasonably clear, under one portion of the insurance policy, coverage in order to influence settlements under other portions of the insurance policy coverage; or

✦ Failing to provide promptly a reasonable explanation of the basis in the

EXHIBIT C

insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

## COUNT 9:
## DAMAGES

72.     Plaintiffs incorporate the preceding paragraphs by reference herein.  Plaintiff's damages for the actual repairs of the exceed $1,700,000.  Lost profits from the rooms uninhabitable or while being reconstructed exceeds $350,000.  Pursuant to the relevant portions of the TEXAS FINANCE CODE, Plaintiff pleads for pre and post judgment interest at the maximum legal allowable rate. Plaintiff was injured as a proximate result of the aforementioned conduct of the defendant. Plaintiff would show that it had been required to employ legal counsel to represent them in this cause and have agreed to pay reasonable attorneys' fees for such services. Plaintiff pleads the remedy of diminution in value damages; repair and replacement , as well as actual damages, attorneys' fees, taxable court costs, interest, all expenses, for conduct which was negligent, knowingly, and/or intentionally, and all damages set forth in the pattern instructions for which the above causes of action pertain; and all damages are plead alternatively, in combination, singularly, collectively and disjunctively.   Accordingly, both measures of damages are appropriate in addition to  the  other  damages  for which Plaintiff is entitled  under the above causes of action.  As a direct result and proximate result of the above-referenced acts and omissions of Defendant, Plaintiff has suffered injuries in the past. The effects of these injuries continue to

EXHIBIT C

manifest themselves in the present, and continued negative effects will likely continue into the future.   Judgment against Defendants jointly and severally for actual damages to be determined at trial;  Prejudgment and post judgment interest as provided by law;  Statutory, exemplary and punitive damages in an amount to be determined at trial; Plaintiff s reasonable and necessary attorneys' fees; and Plaintiff s costs.

## COUNT 10:
## EXEMPLARY DAMAGES

73. Defendants' acts or omissions as alleged herein, when viewed objectively from the standpoint of the actor at the time of their occurrence involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Defendants had  actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others. Consequently, Plaintiff is entitled to  recover exemplary damages under Chapter 41 of the Civil Practice and Remedies Code.

## JOINT AND SEVERAL LIABILITY

74. Plaintiffs incorporate the preceding paragraphs by reference herein.

75. Defendants each owed their respective duties to Plaintiffs, each breached those duties independently, and are jointly and severally liable for Plaintiffs' entire injuries because the injuries to the Plaintiffs are indivisible. Plaintiffs' indivisible injuries arise from, and are directly attributable to, Defendants' statutory wrongs. It is no defense for any of the Defendants that, notwithstanding their own negligence, the injury

EXHIBIT C

would not have resulted if the other had not also been negligent.

76. Defendants acting in concert breached a common duty, knowingly participating in another's breach of duty, or otherwise acted jointly. In that Defendants owed Plaintiffs the same duty of care and their acts resulted in the same breach of that duty, Defendants' breach is a joint tort.

## CONDITIONS PRECEDENT

77. All conditions precedent to Plaintiffs' recovery have been performed, have occurred, or have been waived.

## JURY DEMAND

78. Plaintiffs hereby request trial by jury.

## PRAYER

**WHEREFORE**, Plaintiffs request that Defendants be cited to appear and answer, and that on final trial by jury, plaintiff have judgment against Defendants, jointly and severally, for:

1. Actual, additional, and exemplary damages and lost profits; treble damages;

2. Pre- and post-judgment interest at the highest rates allowed by law;

3. Attorney's fees;

4. Costs of Court; and

5. Such other relief, at law or in equity, to which Plaintiffs may be justly entitled.

EXHIBIT C

Respectfully submitted,

LAW OFFICE OF CHARLES McGARRY

*/s/ Charles W. McGarry*

_____
Charles W. McGarry
Texas Bar No. 13610650
701 Commerce Street, Suite 400
Dallas, Texas  75202
(214) 748-0800
(214) 748-9449 fax
cmcgarry@ix.netcom.com

ATTORNEY FOR PLAINTIFF

EXHIBIT C