IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SPIH TYLER, LLC., INDIVIDUALLY AND AS ASSIGNEE OF HARVEST CONSTRUCTION GENERAL CONTRACTING, INC., | § § § § | |
| *Plaintiff,* | § § | |
| V. | § | CASE NO. 3:17-CV-1292 |
| | § § | |
| LIBERTY MUTUAL INSURANCE CO., AMERICAN ZURICH INSURANCE CO., IMA, INC.; CONTINENTAL INSURANCE CO., CONTINENTAL CASUALTY COMPANY; and TRAVELERS INSURANCE COMPANY, WOODSPRING HOTELS PROPERTY MANAGEMENT, f/k/a VALUE PLACE PROPERTY MANAGEMENT LLC, WOODSPRING SUITES CONSTRUCTION SERVICES LLC F/K/A VALUE PLACE CONSTRUCTION SERVICES, | § § § § § § § § § § § § § | |
| *Defendants.* | § | |

## FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiff SPIH Tyler, LLC, files this first amended complaint complaining of

Defendants LIberty Mutual Insurance Co., American Zurich Insurance Co., IMA, Inc.,

Continental Insurance Company, Continental Casualty Company, Travelers Insurance

Company and adding Woodspring Hotels Property Management LLC formerly known as

Value Place Property Management LLC and Woodspring Suites Construction Services

LLC formerly known as Value Place Property Management LLC, and for cause of action would respectfully show the following:

## I.
### THE PARTIES

1.  Plaintiff, **SPIH Tyler, LLC,** is a Texas Limited Liability Co. with its principal office in  Dallas County, Texas.

2.  Defendant **Liberty Mutual Insurance Co.** is a Massachusetts corporation located at 175 Berkeley Street, Boston, MA 02116 and doing business in Texas and may be served by serving Liberty Mutual Insurance at 2400 Lakeside Blvd Suite 400 Richardson, TX 75082.

3.  Defendant **American Zurich Insurance Company** has filed an answer and appeared herein.

4.  Defendant **IMA, Inc.**, has filed an answer and appeared herein.

5.  Defendant **Continental Insurance Company**, has filed an answer and appeared herein.

6.  Defendant **Continental Casualty Company**, has filed an answer and appeared herein.

7.  **Travelers Insurance Company** has filed an answer and appeared herein.

7.1 **WoodSpring Hotels Property Management LLC,** formerly known as  Value Place Property Management LLC,  is a Kansas limited liability company with its primary place of business in Kansas, and may be served by serving its registered agent KAREN

PICKENS Registered Office: 8621 E. 21ST Street North Suite 250, Wichita, Kansas 67206.

7.2.  **Woodspring Suites Construction Services LLC** f/k/a Value Place Construction Services LLC, A Kansas Limited Liability Company and may be served by serving its registered agent KAREN PICKENS Registered Office: 8621 E. 21St Street North Suite 250, Wichita, Kansas 67206.

## II.

### JURISDICTION AND VENUE

8.  Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332 because there is diversity of citizenship of the parties and the matter in controversy exceeds the sum or value of $75,000.

9.  Venue is proper in this Court pursuant to 28 U.S.C. §1391 because the contracts signed and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## III.
### SUMMARY OF CLAIMS

10.  Plaintiff is a franchisee of Value Place Hotels and constructed a hotel in Tyler Texas.  WoodSpring Suites, formerly Value Place, is the nation's fastest growing value extended stay hotel brand with 196 hotels located in 32 states. The company owns 84 of the properties and provides management services for both company-owned and franchised locations.  Plaintiff entered into a construction supervision agreement with

Value Place Construction Services LLC, ("VPCS" or "Construction") and management contract with Defendant Value Place Management Co. LLC. ("VPMC" or "Management")  to construct and operate the Hotel in Tyler Texas. The construction supervision contract with VPSC was to provide supervision services and to make sure that the design and construction of the Hotel was compliant with the plans, specifications requirements and quality control of the Franchisor, and the management contract with VPMC included the responsibility to maintain insurance and comply with the insurance policies reporting and coverage requirements, specifically complying with the claim obligations for any occurrence under the applicable policies. Plaintiff obtained insurance to cover the construction risks and obtained insurance to cover the operation of the Hotel. The construction and operation of the Value Place Hotel (the "Hotel") was insured at every stage by Defendant Insurance companies offering turnkey contractual coverage and group policies for the contractor, the franchise and the individual franchise location. Following the discovery of covered claims, defective design and construction of the hotel, at no time did VPMC make a claim on any of the policies of coverage available to make the necessary repairs. Plaintiff after retaining an expert to evaluate the water damage to the Hotel made claim upon the various insurance carriers for coverage.  Each claim was refused,  denied or ignored.  The claims made by Plaintiff included notice to defendant IMA, the broker who ignored the notice and failed to give notice to some of the various carriers whom it had procured insurance for Plaintiff for the various stages of

construction and operation of the Hotel and for whom it was the designated party for notice of the occurrence of insured claims.

11. Defendant, Harvest Construction General Contracting, Inc. work was defective and the defective and negligent acts were occurrences under the Continental Policies and the ensuing water damages were occurrences covered under the policies in effect from time to time. The Insurance Company Defendants engaged in acts and omissions constituting "unfair claims settlement practices" , including one or more of the following:

• Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

• Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies

• Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

• Refusing to pay claims without conducting a reasonable investigation based upon all available information;

• Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;

• Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

• Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds;

• Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application;

• Attempting to settle claims on the basis of an application which was altered without notice to, or knowledge or consent of the insured;

• Making claims payments to insured or beneficiaries not accompanied by a statement setting forth the coverage under which payments are being made;

• Making known to insured or claimants a policy of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements of compromises less than the amount awarded in arbitration

• Delaying the investigation or payment of claims by requiring that an insured or claimant, or the physician of either, submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information;

• Failing to settle claims promptly, where liability has become reasonably clear, under one portion of the insurance policy, coverage in order to influence settlements under other portions of the insurance policy coverage; or

• Failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

As to WoodSpring Hotels Property Management LLC And Woodspring Suites Construction Services LLC, both of whom have breached their contracts, with failure to comply with the promises, representations and duties set forth in the parties agreements, including failure to supervise construction and perform operations, which included the timely reporting of insurance claims.

IV.
**FACTUAL BACKGROUND**

12. Defendant Harvest Construction General Cont. Inc. of Olathe Kansas, working off of plans and design drawn by Howard+Helmer Architects, P.A. of Overland, Kansas

constructed the Tyler Value Place [Architects Project No. 07235.00] beginning in 2007 and finished in 2008. Design deficiencies and construction defects have caused the extensive damages to the Hotel and Plaintiff.  The resulting damages have required the removal and replacement of the exterior cladding of the entire structure at a cost of almost half of the original construction cost.  Howard+Helmer failed to design the hotel with  "Exterior walls that provide the building with a weather-resistant wall envelope as required by  Int'l Bldg Code § 1405.2 (Int'l Code Council 10th ed. 2003).  Harvest failed to construct the hotel with a water resistant wall envelope, roof system, flashing and were negligent in numerous aspects of the construction and comply with the manufacturer's express installation instructions.

13.  On or about July 16, 2007 the Plaintiff entered into a A.I.A Document 8151'" - 1997 Abbreviated Standard Form of Agreement Between Owner and Architect wherein Howard+Helmer is identified as the Architect and SPIH Tyler, LLC is identified as the Architect's "Client" and as the "Owner".  A separate AIA Document A101-1997 Standard Form of Agreement Between Owner and Contractor was entered into between Harvest and Plaintiff to build the Tyler Value Place Hotel according to the plans and construction documents prepared by Howard+Helmer specifically for Plaintiff.  The Tyler Value Place Hotel is an approximately 42,640 sq. ft, this four-story extended stay hotel is comprised of 124 units of either one or two bed studio rooms, with kitchen area in rooms with on-site laundry facilities.

14. As required by the Construction Documents, Defendant Harvest Construction procured an occurrence General Commercial Liability (a "GCL") policy in the amount of $2,000,000 from Defendants continental insurance company Policy C2089103966 and Defendants continental insurance company Policy C2090347944 through Defendant IMA of Kansas, Inc. The Certificate (Accord form 25-S) dated Nov. 16, 2007 bound CGL coverage for policy periods to cover the duration of construction.   The effective date of the policies was for 03/09/2007 to 03/09/2008.   Plaintiff is the Certificate Holder, and was also a named additional insured on both policies.  Plaintiff brings suit as a first party insured seeking property damage done to the Tyler Value Place resulting from construction defects. The Defendants Continental Casualty and Continental Insurance will be collectively referred to as Continental unless separate identification is necessary. Plaintiff entered a settlement agreement with Harvest and took assignment of all of Harvest's rights, including those under the Continental policies.

15.  On or about January 2016 Plaintiff gave notice of claim against to defendants IMA, for Continental Insurance Companies, American Zurich Insurance Company and Continental Casualty Co. of the occurrence of property damage arising from construction defects. Each wholly failed to investigate the claims, adjust the claims and comply with the requirements of the Texas Insurance Code and engaged in deceptive trade practices.

16.  The CGL policies provides that the insurance carrier "will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies and will "defend the insured against

any suit" seeking those damages.  The policy further provides that insurance applies to "bodily injury" or "property damage" only if the "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the coverage territory.  The occurrence here are deliberate acts, performed negligently, which are an accident as the effect is not the intended or expected result, that is, the result would have been difference had the deliberate act been performed correctly.  The property damage described herein are the result of undiscovered accidents, and acts not performed properly during the course of construction. The accidents resulted in serious property damage, including loss of use of portions of the property.

17. These two AIA construction documents, integrate the construction drawings, plans and other design documents, which collectively will be referred to as the Construction Contract, executed in Dallas Texas by Plaintiff and Harvest which the defendant Howard+Helmer agreed to design and Harvest agreed to act as a General Contractor and construct the "Value Place Hotel at 3210 S. Southwest Loop 323 Tyler Texas, according to a definite scope of work pursuant to an approved schedule.

18. Howard+Helmer Architecture is a full-service architectural firm offering a complete range of services from Master Planning, all the way through project completion. The firm markets itself as "believing in going the extra mile with a client-oriented attitude of service and with a commitment to develop each project to its maximum potential."  Howard+Helmer were retained because of their experience in the design of hospitality projects, specifically the Value Place hotel chain, having designed hotels for

19 franchisees' in approximately 30 states providing site investigations, pre-design architectural site adaptations, and construction document services for this extended stay hotel concept and to create prototype upgrade drawings for franchisor, Value Place, LLC. The wood-frame building was usually designed with a cement board lap-siding and composite shingle sloped roof with Gable vents and bump-outs help create a more aesthetic appeal.  Departing from their usual design, Howard+Helmer designed the Tyler Value Place using stucco and synthetic stone exterior cladding. Their design was negligent and Howard+Helmer failed to adhere to the manufacturer's recommended installation instructions and generally accepted building practices and the Int'l Bldg. Code § 1405.2 (Int'l Code Council 10th ed. 2003).

20. Defendant Harvest Construction General Cont. Inc. of Olathe Kansas, working off of plans and design drawn by defendant Howard+Helmer Architects, P.A. of Overland, Kansas constructed the Tyler Value Inn [Architects Project No. 07235.00] beginning in 2007 and finished in 2008.

21. The stone cladding and stucco design by Howard+Helmer specified a sole source stone provider, Lone Star Stone, Inc. (with no substitutions allowed). The stone used was manufactured stone, a product known as Ledgestone veneer (Veneer types as shown on drawings).[1]  Manufactured Stone Veneer is a product that has the appearance of natural stone, but is manufactured with concrete.   The material itself is porous, the no grout installation method  (just stacked open fit, adhered to the Tyvek with cement which leave

---

[1]Color: Cordova. Headerstone (Trim and Accessory types as shown on drawings.) Color: Maple

open paths, channels and gaps that allow ready water penetration necessitating an adequate water barrier to protect the OSB sheathing, insulation and framing and interior drywall.

22.   Problems using Manufactured-Stone was known in the construction trade for years before the Tyler project. The need for proper flashing, two layers of heavy duty building paper and weep holes to keep wall from getting wet, if not the use of an air gap or drainage wall system.   See Manufactured-Stone Nightmares, Journal of Light Construction, December 2004.

23   The IBC standard WRB material can be defined as ASTM D-266 Type I asphalt-saturated felt or alternate material with equal or better ability to prevent water penetration. Howard+Helmer had no ASTM standard to evaluate the equivalency of Tyvek to the asphalt-saturated felt in water resistance performance, having no stated criteria to assess water performance equivalency of Tyvek or to compare them with the code-specified D-266 Type I asphalt-saturated felt.

24. The apparent dead-end in WRB penetration performance criteria is addressed by a document entitled,   Acceptance Criteria for Water-Resistive Barriers, also known as AC38, which is published by the same organization that publishes the IBC (International Code Council, Inc., also known as ICC). Although this document is not directly referenced by the code, its stated purpose is "to establish requirements for recognition of water-resistive barriers in ICC Evaluation Service, Inc. evaluation reports under the 2003 International Building Code (IBC), the 2003 International Residential Code (IRC), the

1999 BOCA National Building Code (BNBC), the 1999 Standard Building Code (SBC), and the 1997 Uniform Building Code (UBC)."

25. AC38 groups WRB materials into three categories: paper-based, felt-based, and polymeric-based barriers. Felt-based WRBs are defined as "asphalt-saturated organic felts that comply with ASTM D-226 and are intended for use as water-resistive barriers." This definition is the same as that provided by the ICB and offers no additional information regarding water resistance performance. Water resistance test data are not included in the information required to be submitted for approval of felt-based materials as WRBs.

26. The choice of Tyvek as a sole and single layer barrier invited further problems. The manufactured stone, exposed to the sun, turns trapped water into steam and vapor, which penetrates through the "micro-perforations," or thousands of holes in the Tyvek, which by design, allow the building to breathe. Howard+Helmer failed to consider the water intrusion problems well known in the industry, including capillary suction, surface tension, and the real world moisture transport mechanism that affect the in-service performance of WRBs. See Interf. Age November 2005.

27. The manufacturer, Lone Star Stone provided its own installation instructions, which included a specification of a water resistant barrier, ASTM D 226 No. 15 non-perforated asphalt-saturated organic felt) (UBC Standard l4-1 kraft waterproof building paper) otherwise known as 15 lb. felt or tar paper. Howard+Helmer cut and pasted this instruction into its project manual, but despite this specific instruction, Howard+Helmer

specified the Tyvek wrap in the building plans and drawings.   **Tyvek is a breathable weather barrier, not a water resistant barrier.**   Tyvek is a unique material science helps prevent the infiltration of air and water, but allows water vapor escape (and enter) to prevent rot and mold inside walls.   Howard+Helmer made specific directions on the type of stone, its physical characteristics and method of installations, and particularly the moisture barrier to be used with the stone product, to wit:   "Material: Veneer Units: Pre-cast veneer units consisting of Portland cement, sand, lightweight aggregates, and mineral oxide pigments.

    1. Physical Properties:
    a. Compressive Strength: ASTM C 513, 5 sample ave.........2,200psi(15 MPa)
    b. ShearTest: ASTM C 482,............. ............50 psi (335 kPa)
    c. Water Absorption: UBC Standard 32-12,........... ...22percent
    d. Freeze-ThawTest: ASTM C67,............ ……….0.6T percent
    e. Thermal Resistance: ASTM C 177.............. .....RO.6O(0.11)

    f. Density: ASTMC567(Dry density)………………….75pcf(l200kgper m3)

    Moisture Barrier: (ASTM D 226 No. 15 non-perforated asphalt-saturated organic felt) (UBC Standard l4-1 kraft waterproof building paper)

   NOTE: This is not what compliant with what would become the industry standard, which calls for two layers of Moisture Barrier.  A standard developed after known failures of Tyvek.   With just one layer specified,   Tyvek would not have been an acceptable alternative to 15LB felt.   Not suggesting that one layer of anything is an acceptable substitute to the specified two layers of WRB.

   Reinforcing: (ASTM C 847 galvanized expanded metal lath) (ASTM C 847 painted expanded metal lath) (l inch galvanized steel, 18 gauge woven wire mesh) complying with code agency requirements for the type of substrate over which stone veneer is installed.
Mortar:
    l. Cement: Any cement complying with ASTM C 270.

    2. Lime: ASTM C 207.
    3. Sand: ASTM C l44, natural or manufactured sand.
    4. Pigment: ASTM C979,mineral oxide pigments'
    5. Water: Potable.
    6. Pre-Packaged Latex-Portland Cement Mortar: ANSI A1 18.4'
    Bonding Agent; Daraweld C as manufactured by Grace Construction, or
    equal Products.1
    Sealer: 'Water based silane or siloxane masonry sealer, clear or semigloss finish
per              owners approval.

INSTALLATION:

    1. Install and clean stone in accordance with manufacturer's installation
instructions for        Standard Grouted Joint installation.
    2. Apply sealer in accordance with sealer manufacturer's installation instructions.

28.  DuPont™ Tyvek® HomeWrap® is the original house wrap, incorporating unique

material science that helps keep air and water out, while letting water vapor escape.  As a

result, it can contribute to improved building durability by helping to protect homes

against damaging wind and rain that can penetrate the exterior cladding.   Tyvek®

HomeWrap® can also reduce home energy bills by controlling air flow and water

intrusion, which helps insulation work better, allowing the HVAC system to work more

efficiently.  It's a house wrap engineered to keep homes cool in the summer, warm in the

winter, and dry all year round (when combined with an effective exterior cladding such as

Hardi-Board).

29. The unique nonwoven structure of Tyvek® HomeWrap® makes it breathable,

allowing moisture vapor to pass through. This helps promote drying in wall systems, to

help prevent mold and water damage, but is not meant to be the sole barrier from the

elements.  It lets ambient moisture vapor back into the structure.  Through a combination of water sources directly entering the manufactured stone cladding, some directed onto the stone by a defective guttering system, others trapped by exterior penetrations such as the HVAC units, water and water vapor began to soak the OSB board, then the insulation, the wooden framing, then revealing itself through the interior drywall.  By the time the moisture was detected from the interior, the exterior damage was done.

30.  Tyvek® HomeWrap® is a perforated wrap. Perforated house wraps require "micro-perforations," or thousands of holes, to allow the product to breathe. While this can help keep moisture from getting trapped inside walls, it also gives water and air a way in. Perforated wraps give up a great deal of resistance to air and water penetration in order to achieve some level of vapor permeability. Water and air infiltration can lead to the potential for water damage and make insulation less effective, leading to higher energy costs.

31.  The National Concrete Masonry Association (the "NCMA") is the national trade association representing the producers and suppliers of concrete masonry products, including concrete block, manufactured stone veneer didn't publish WRB instructions until 2009.

## V.
## DISCOVERY OF THE WALL SYSTEM FAILURE

32.  Plaintiff retained Exterior Consulting Innovations, Inc. (ECI) to conduct an investigation of the water penetrations (leaks) found in the exterior walls at the Value

Place Hotel - Tyler and to supervise the repairs.  On Tuesday, November 10, 2015, ECI visited the site to conduct a visual assessment of the reported water intrusion issues present in the facility. During this visit, ECI interviewed site personnel associated with the facility, reviewed available documentation and visually inspected the facility. Interior finishes (drywall) had been previously removed from exterior walls at several of the units. This allowed ECI to inspect and document types, locations and the severity of the water migration into the wall system. ECI reviewed the construction specifications and the construction drawings provided. The specifications require one layer of weather barrier similar to Tyvek Commercial Wrap in three different specification sections, Rough Carpentry Section, Sheathing Section and Siding Section. There were no specifications for the dry set fieldstone and the drawings do not have details for this installation

33.  ECI returned to commence destructive testing in February 2016 which involved opening up the wall cavity.  The scope of work evolved into the "Worst Case Scenario" necessitating the removal of the entire exterior cladding of stone and stucco, replacement of significant portions of the exterior sheathing and some structural studs, and inside of the exterior walls had been saturated for an extended period of time, causing rot in the building studs and extreme deterioration of the Oriented Strand Board ("OSB"), the particle board that once served to support and stabilize the studs.  ECI concluded the water intrusion was caused by multiple design failures, failure to follow building code standards as well as site-specific building standards and failure to construct the water resistant barrier, the ("WRB").

34. Their investigation revealed water damage to the walls of the structure, caused by the improper design and installation of the stone and stucco system, which had compromised the load-bearing functions of the structure to the extent that the structure had become unsafe. Additionally, the water intrusion had created unsanitary conditions allowing mold, mildew, and insect infestations to thrive.

35. The Manufactured Stone Veneer was added to the design plans by Addendum Number 7.    The Moisture Barrier specified in Section 04730 – Manufactured Stone Veneer is UBC Standard 14-1 Kraft Waterproof Building Paper (ASTM D 226 No. 15 **non-perforated** asphalt saturated organic felt). There are exposed areas where the OSB sheathing has deteriorated and the weather barrier is visible from the interior. ECI verified that there is one layer of weather barrier installed over the sheathing. Sections of the weather barrier were turned into the rough openings around the windows, which were labeled with Tyvek information; therefore, a Tyvek weather barrier product was utilized on the project behind the stone. The Tyvek Building Wrap was installed in lieu of 15# felts.  When the designed was changed from Hardi-board to Stone, the   WRB  was  not changed, and the Tyvek was deficient as a WRB.  The design failures include failure to follow The International Building Code, which contains the following requirement: "Exterior walls shall provide the building with a weather-resistant wall envelope." Int'l Bldg Code § 1405.2 (Int'l Code Council 10th ed. 2003).

36. The Tyvek paper "be applied horizontally with upper layers overlapping the lower layers by no less than two inches" before the application of the stucco. Significantly,

when ECI cut into the exterior walls of the structure, they discovered the Tyvek paper had been lapped around the wall in reverse, channeling water toward the OSB and building studs rather than repelling it away from the structure. Furthermore, the Tyvek paper had been wrapped to the inside of the structure's flashing materials, encouraging rather than preventing water intrusion.

## VI.
## DEFECTIVE ROOF, GUTTER
## AND
## DRAINAGE DESIGN AND CONSTRUCTION

37. Another major design and construction defect concerned the structure's roof and gutter system.  Certain portions of the roof were not designed with gutters and rain water was directed onto the wall system, further aggravating the water penetrations.  Rain gutters properly installed along the edge of a roof can help prevent water damage to a building and its landscape and hardscape in several important ways. The primary function of a roof guttering system is to direct water from the roof of a home or building to the ground in such a way that it does not damage or run down the outer walls of the building causing damage to the building or environs.  As the roof was designed and lacking adequate guttering, water was directed onto the building and air conditioning units where the damage became more evident when the stone cladding was removed.

38. Another major defect concerned the structure's flashings. ECI found the flashings installed around the windows and doors were inadequate. Below exterior doors, pan flashings should have been installed to collect and drain water away from the building. However, ECI determined that these flashings were improperly installed resulting in water damage that penetrated the subfloor, causing swelling of the subfloor and eventual damage to carpets. Above doors and windows, lack of adequate head flashings resulted in such significant water damage to the trim of the structure that one door casing was so saturated ECI could not even take a moisture meter reading. Instead, to demonstrate the extent of the decay, he sunk the entire metal length of his car key into the door casing with almost no effort and took a photograph.

39. Other major structural defects discovered include: inadequate kick out flashing where the wall system met the roof and a lack of maintainable caulk joints where the stucco wall met the brick allowing water penetration as the different materials expanded unequally. All four exterior load-bearing walls suffered considerable water intrusion, resulting in saturated and rotting OSB, rotting studs, and soaked insulation.  Major elements of restoration of the structure will include tearing off all of the stone, stucco and Tyvek paper, removing all of the OSB, temporarily jacking and securing the property, replacing decaying building studs, and reconstructing parts of all four exterior load-bearing walls.

a. The stucco and stone exterior of the structure was not properly applied over an adequate WRB and was not sealed, allowing water to come into contact with the walls and accumulate between the stucco and the walls;

b. This water accumulation over time caused the OSB plywood walls nailed to the studs on the first floor to rot away. The OSB plywood serves a structural purpose by holding the structure supporting studs together. This constitutes actual physical damage;

c. This water accumulation has also caused the load bearing studs themselves to begin to rot and will slowly over time, cause them to rot;

d. This water accumulation also cause[d] the frames to rot, so that the front door frame was so softened that a key could be sunk in the transom over the door.

e. These conditions were due to lack of an adequate water barrier and non-compliance with building standards.

f. These conditions were not caused by nail holes, screw holes, the roof, lack of proper maintenance, or hurricanes.

g. The exterior of the structure is 60% manufactured stone and 40% stucco.

40. Based on these findings, ECI concluded that "major structural defect" existed and evidence of defects in design and workmanship.

## VII.
## CAUSES OF ACTION

### COUNT 1:
### BREACH OF CONTRACT
### AGAINST HARVEST CONSTRUCTION GENERAL CONTRACTING, INC. WOODSPRING HOTELS PROPERTY MANAGEMENT LLC AND WOODSPRING SUITES CONSTRUCTION SERVICES LLC FORMERLY KNOWN AS VALUE PLACE PROPERTY MANAGEMENT LLC

41. All factual allegations set forth elsewhere in this petition are incorporated by reference as if specifically alleged herein and in support of this cause of action.

42. Defendant Woodspring Suites Construction Services LLC formerly known as Value Place Property Management LLC failed to adequately supervise, manage and oversee the construction by Harvest, failed to see that Harvest complied with the the terms and conditions of the AIA Document A 101-197; A201 - 1997 and Project Manual General Condition of the Contract for Construction. The failure to supervise was a material breach because Defendant has failed to perform material obligation required pursuant the agreement. The failure to supervise, remediate defects, complete punch list items and to properly construct the wall system greatly contribute to significant operating problems and a lack of confidence in the completed work. Certain defects and defective plumbing items were immediately known to Plaintiff and remedied during the punch list phase of the construction. The defects and deficiencies in the construction of the wall system was concealed within structure and not known until ECI began its destructive investigation of the wall system, and the extent of which was not known until the entire wall system was removed.

43. Plaintiff has been and will continue to be injured by this breach, by the delays and loss of complete use of the structure as intended and by the expected damage and

interference by continued leaks in the premises. The damages are a natural and probable cause of these breaches in that they directly flow from the failure of Defendant to fulfill its obligations under the construction contract.

44.   At or near the "punch list" stage of construction, Plaintiff was informed of the existence of numerous liens which had been filed by vendors to the Hotel construction, and filed suit against Harvest which was settled by Plaintiff using the retainage to settle the lien claims, taking an assignment of Harvest's rights of all kinds, including those of indemnity against its insurance carriers, the Continental Companies.  While at the time, the construction defects where unknown to Plaintiff,  its claims against Harvest were insured under the GCL policies which Harvest had been required to obtain and which Plaintiff was made a named insured and holder of the benefits of the policies.

45.   WoodSpring Hotels Property Management LLC, retained to operate breached its contact and was negligent in it's duty of management of operations of the Hotel and failed to report the claims to the insurance carriers it had agreed to do in its contract.

## COUNT 2
## BREACH OF CONTRACT
## LIBERTY MUTUAL INSURANCE CO., AMERICAN ZURICH INSURANCE CO., CONTINENTAL INSURANCE COMPANY, CONTINENTAL CASUALTY COMPANY, TRAVELERS INSURANCE COMPANY

46. All factual allegations set forth elsewhere in this petition are incorporated by

reference as if specifically alleged herein and in support of this cause of action.

47. Each defendant insurance company breached their contract of insurance with Plaintiff, and further violated the Texas Insurance Code by one or more of the following acts, and wholly failed to investigate the claims, adjust the claims and comply the requirements of the Texas Insurance Code.

48. The CGL policies provides that the insurance carrier "will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies and will "defend the insured against any suit" seeking those damages. The policy further provides that insurance applies to "bodily injury" or "property damage" only if the "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the coverage territory. The occurrence here are deliberate acts, performed negligently, which are an accident as the effect is not the intended or expected result, that is, the result would have been difference had the deliberate act been performed correctly. The property damage described herein are the result of undiscovered accidents, and acts not performed properly during the course of construction. The accidents resulted in serious property damage, including loss of use of portions of the property.

## COUNT 3:
## BREACH OF WARRANTY - EXPRESS &  IMPLIED AGAINST  HARVEST CONSTRUCTION   GENERAL   CONTRACTING, INC.

49. Plaintiff, SPIH Tyler, incorporates the foregoing paragraphs by reference as though fully set forth herein.

50. The Defendant expressly warranted in writing that the Defendant would do the work required by the contract in a good and workmanlike manner, but the Defendant breached that warranty in that Defendant failed to properly install the exterior cladding, the exterior water proof barrier,  flashing, seams and window systems, the gutter system and the roofing system, with more defective work in the plumbing systems and other punch-list items. The reasonable estimated cost of rectifying the defects in the defendant's performance is $ $1,550,000.00. In addition, as a result of the leaky plumbing, the interior walls, and ceilings, the building was and is damaged by water, necessitating resurfacing the entire cladding of the stone and stucco finish, as well as damage done to the OSB board exterior and insulation, drywall, walls and ceiling. Further the electrical system is also being affected by the repeated water instruction from faulty plumbing thereby cause a potentially dangerous situation to health, safety and welfare of the occupants. 18.Also, the plumbing system is showing effects of defects to the construction and installation by repeated leaks and failure to perform as a system as designed. The true extent of the defects is unknown until more intrusive

testing and evaluations are conducted.

## COUNT 3.
## NEGLIGENCE AGAINST   HARVEST   CONSTRUCTION
## GENERAL   CONTRACTING, INC.

51.  Plaintiff, SPIH Tyler, incorporates the foregoing paragraphs by reference as though fully set forth herein.

52. The Defendants breached their duty of ordinary care in evaluating, preparing, conducting and completing the construction and then the repairs in question. Defendant had the following common-law duties to Plaintiff:

a.  The duty to prevent injury to Plaintiff if it reasonably appears or should appear that in the exercise of Plaintiffs ' lawful rights, Plaintiff or others may be injured by a dangerous or non- compliant condition that was created by Defendant;

b.  The duty to exercise reasonable care to avoid a foreseeable risk of damage to Plaintiff;

c.  The duty to take affirmative action to control or avoid increasing the cost and economic injury from conduct which Defendant has at least partially created;

d.  The duty to use ordinary care in aiding or protecting Plaintiff from economic peril when the peril is under the control of Defendant;

e. The duty to use ordinary care in making representations and in ascertaining the accuracy of information given to Plaintiff and other parties whom had discretionary control over Plaintiff s foreseeable need to utilize   a properly completed property construction;

f.  The duty to exercise reasonable care in performing services, whether gratuitously or for consideration, that Defendant should recognize as necessary for protection of other persons or things;

g. The duty to exercise reasonable care in performing services for another, whether gratuitously or for consideration, that Defendant should recognize as necessary for the protection of Plaintiff or Plaintiff s property; and

h. The duty to use reasonable care when referring others in connection with services to Plaintiff.

53. Defendant breached its various duties owed to Plaintiff by failing to, among others, to do the following:

a. In failing to act as a person of ordinary prudence would have acted under the same or similar circumstances in carrying out these duties, Defendant was negligent ;

b. In not completing its scope of work on agreed time table and m the actual performance of its services;

c. In failing to properly construct in accordance with the information provided; In failing to properly supervise sub-contractors;

d. In failing to properly make timely and proper repairs or recondition of deficient work;

e. In failing to properly remediate defective plumbing installations or the lack there of;

54.   In failing to act as a person of ordinary prudence would have acted under the same or similar circumstances in carrying out these duties, Defendant was negligent. This negligence proximately caused property damage, economic loss and loss of use and enjoyment of property to Plaintiff, for which it now sues

55. Defendant's acts or omissions as alleged herein, when viewed objectively from

the standpoint of the actor at the time of their occurrence involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Defendant had actual, subjective awareness of the risk involved, but nevertheless preceded with conscious indifference to the rights, safety, or welfare of others. Consequently, Plaintiff is entitled to recover exemplary damages under Chapter 41 of the Civil Practice and Remedies   Code.

## COUNT 4
### DECEPTIVE TRADE  PRACTICES ACT VIOLATIONS
### AGAINST LIBERTY MUTUAL INSURANCE CO., AMERICAN ZURICH INSURANCE CO., CONTINENTAL INSURANCE COMPANY, CONTINENTAL CASUALTY COMPANY, TRAVELERS INSURANCE COMPANY,

56.   Plaintiff, SPIH Tyler, incorporates the foregoing paragraphs by reference as though fully set forth herein.

57.  In addition to the foregoing, Harvest, Continental Insurance Company, Continental Casualty Company,  and American Zurich Insurance Co. actions constitute the following false, misleading, or deceptive acts or practices under sec 17.46(b) of the DTPA:

> (5)Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have.

> (6)Representing that goods or services are of a

particular standard, quality, or grade, or that goods are
of a particular style or model, if they are of another;

## COUNT 5:
## BREACH OF CONTRACT AGAINST CONTINENTAL AND IMA

58. Plaintiff, SPIH Tyler, incorporates the foregoing paragraphs by reference as though fully set forth herein. Continental has breached virtually all of its contractual obligations to Plaintiff including at least the following provisions:

59. IMA was designated as the party for notice of claims and after having been given notice failed to convey that notice to the Continental Companies who subsequently denied coverage and wholly failed to investigate Plaintiffs' claim, and its total abdication of that duty by Defendant IMA, constitutes a separate breach of contract, as did Continental's failure to pay Plaintiffs' claim in accordance with the Loss Payment provision of the policy of insurance.

60. Each of Continental's breaches, separately and in conjunction, proximately caused damage to Plaintiffs for which they now sue.

61. Plaintiffs have made written demand upon Continental, which demand was refused.

62. Consequently, she is entitled to recover her reasonable attorneys' fees pursuant to Chapter 38 of the Civil Practice and Remedies Code.

63. Plaintiffs further seek to recover the 18% penalty on the amount due on her

claim under the insurance policy pursuant to Article 21.55, § 6.

## COUNT 6:
### ARTICLE 21.21 VIOLATIONS AGAINST LIBERTY MUTUAL INSURANCE CO., AMERICAN ZURICH INSURANCE CO., CONTINENTAL INSURANCE COMPANY, CONTINENTAL CASUALTY COMPANY, TRAVELERS INSURANCE COMPANY

64.    Plaintiff, SPIH Tyler, incorporates the foregoing paragraphs by reference as though fully set forth herein. Defendants Continentals' and IMA' actions violate Texas Insurance Code Article 21.21, § 4(10)(a)(i)(ii)(iii)(iv)(v) & (viii) in that they involve:

- misrepresenting to a claimant a material fact or policy provision relating  to coverage at issue;

- failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the insurer's liability has become reasonably clear;

- failing to attempt, in good faith, to effectuate a prompt, fair, and equitable settlement under one portion of a policy of a claim with respect to which the insurer's liability has become reasonably clear in order to influence the claimant to settle an additional claim under another portion of the coverage, provided that this prohibition does not apply if payment under one portion of the coverage constitutes evidence of liability under another portion of the policy;

- failing to provide promptly to a policyholder a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for the insurer's denial of a claim or for the offer of a compromise settlement of a claim;
- failing within a reasonable time to affirm or deny coverage of a claim  to a policyholder or submit a reservation of rights to a policyholder;

- refusing to pay a claim without conducting a reasonable investigation with respect to the claim.

- In addition, Defendants, by their acts and omissions referenced above,

violated § 17.46(b)(2), (3), (5), (7), (12) and (24) of the DTPA, each of which violation is actionable  under Article 21.21, § 16(a).

• Defendant IMA' actions and omissions as an adjuster also fall under Article 21.21.

65. Defendants' violations of Article 21.21 were a producing cause of Plaintiffs' actual damages, including mental anguish, court costs, and reasonable and necessary attorneys' fees, for which it now sues.   Defendants' acts and omissions as summarized above were committed knowingly and intentionally. Plaintiffs, therefore, seek to recover treble damages under Article 21.21, §16(b), as well.

66.  Plaintiffs further seek to recover the 18% penalty on the amount due on her claim under the insurance policy pursuant to Article 21.55, § 6.

## COUNT 7:
### ARTICLE 21.55 VIOLATIONS AGAINST LIBERTY MUTUAL INSURANCE CO., AMERICAN ZURICH INSURANCE CO., CONTINENTAL INSURANCE COMPANY, CONTINENTAL CASUALTY COMPANY, TRAVELERS INSURANCE COMPANY

67. Defendant Insurance Companies violated Texas Insurance Code Article 21.55, the

Prompt Payment of Claims Act, by failing to timely acknowledge receipt of

Plaintiff's claim, commence an investigation of that claim, and request any

additional information necessary to process that claim.

68. Defendant Insurance Companies further violated Texas Insurance Code Article

21.55 by failing to timely notify Plaintiff in writing of the acceptance or rejection

of the claim, by failing to notify Plaintiff in writing of the reasons for rejecting

the portions of the claim that Defendant Insurance Companies effectively denied,

and by failing to notify Plaintiff in writing that Defendant Insurance Companies

would be unable to comply with the time requirements of the Act.

69. Defendant Insurance Companies further violated Texas Insurance Code Article 21.55 by failing to timely pay Plaintiff those portions of Plaintiff's claims that Defendant Insurance Companies agreed to pay.

70. Defendant Insurance Companies violations of Article 21.55, individually or collectively, were a producing cause of Plaintiffs' actual damages, including repair costs, lost profits, court costs, and reasonable and necessary attorneys' fees, for which Plaintiff now sues.

71. Defendants' acts and omissions as summarized above were committed knowingly and intentionally. Plaintiff, therefore, seeks to recover treble damages under Article 21.21, §16(b), as well.

72. Plaintiffs further seek to recover the 18% penalty on the amount due on Pltaintiff's claim under the insurance policy pursuant to Article 21.55, § 6.


**COUNT 8**
**UNFAIR CLAIMS SETTLEMENT PRACTICES**
**AGAINST DEFENDANTS LIBERTY MUTUAL INSURANCE CO.,**
**AMERICAN ZURICH INSURANCE CO., CONTINENTAL INSURANCE**
**COMPANY, CONTINENTAL CASUALTY COMPANY AND TRAVELERS**
**INSURANCE COMPANY**

73. Plaintiff, SPIH Tyler, incorporates the foregoing paragraphs by reference as though fully set forth herein. The insurance company defendants engaged in one or

more of the following unfair claims settlement practices, including:

◆ Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

◆ Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

◆ Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies

◆ Refusing to pay claims without conducting a reasonable investigation based upon all available information;

◆ Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;

◆ Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

◆ Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds;

◆ Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application;

◆ Attempting to settle claims on the basis of an application which was altered without notice to, or knowledge or consent of the insured;

◆ Making claims payments to insured or beneficiaries not accompanied by a statement setting forth the coverage under which payments are being made;

◆ Making known to insured or claimants a policy of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements of compromises less than the amount awarded in arbitration;

◆ Delaying the investigation or payment of claims by requiring that an insured or claimant, or the physician of either, submit a preliminary claim report and then requiring the subsequent sub- mission of formal proof of loss forms, both of which submissions contain substantially the same information;

◆ Failing to settle claims promptly, where liability has become reasonably clear, under one portion of the insurance policy, coverage in order to influence settlements under other portions of the insurance policy coverage; or

◆ Failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

## COUNT 9:
## DAMAGES

74. Plaintiffs incorporate the preceding paragraphs by reference herein.  Plaintiff's damages for the actual repairs of the exceed $1,700,000.  Lost profits from the rooms uninhabitable or while being reconstructed exceeds $350,000.  Pursuant to the relevant portions of the TEXAS FINANCE CODE, Plaintiff pleads for pre and post judgment interest at the maximum legal allowable rate. Plaintiff was injured as a proximate result of the aforementioned conduct of the defendant. Plaintiff would show that it had been required to employ legal counsel to represent them in this cause and have agreed to pay reasonable attorneys' fees for such services.

Plaintiff pleads the remedy of diminution in value damages; repair and replacement , as well as actual damages, attorneys' fees, taxable court costs, interest, all expenses, for conduct which was negligent, knowingly, and/or intentionally, and all damages set forth in the pattern instructions for which the above causes of action pertain; and all damages are plead alternatively, in combination, singularly, collectively and disjunctively.    Accordingly, both measures of damages are appropriate in addition to  the  other  damages  for which Plaintiff is entitled   under the above causes of action.   As a direct result and proximate result of the above-referenced acts and omissions of Defendant, Plaintiff has suffered injuries in the past. The effects of these injuries continue to manifest themselves in the present, and continued negative effects will likely continue into the future.   Judgment against Defendants jointly and severally for actual damages to be determined at trial;  Prejudgment  and post judgment  interest as provided by law;  Statutory, exemplary and punitive damages in an amount to be determined at trial; Plaintiff s reasonable and necessary attorneys' fees; and Plaintiff s costs.

## JOINT AND SEVERAL LIABILITY

75. Plaintiffs incorporate the preceding paragraphs by reference herein.

76. Defendants each owed their respective duties to Plaintiffs, each breached those

duties independently, and are jointly and severally liable for Plaintiffs' entire injuries because the injuries to the Plaintiffs are indivisible. Plaintiffs' indivisible injuries arise from, and are directly attributable to, Defendants' statutory wrongs. It is no defense for any of the Defendants that, notwithstanding their own negligence, the injury would not have resulted if the other had not also been negligent.

77. Defendants acting in concert breached a common duty, knowingly participating in another's breach of duty, or otherwise acted jointly. In that Defendants owed Plaintiffs the same duty of care and their acts resulted in the same breach of that duty, Defendants' breach is a joint tort.

## CONDITIONS PRECEDENT

77. All conditions precedent to Plaintiffs' recovery have been performed, have occurred, or have been waived.

## JURY DEMAND

78. Plaintiff hereby requests trial by jury.

## PRAYER

**WHEREFORE**, Plaintiffs request that Defendants be cited to appear and answer, and that on final trial by jury, plaintiff have judgment against Defendants, jointly and severally, for:

1. Actual, additional, and exemplary damages and lost profits; treble damages;

2. Pre- and post-judgment interest at the highest rates allowed by law;

3.  Attorney's fees;

4.  Costs of Court; and

5.  Such other relief, at law or in equity, to which Plaintiffs may be justly entitled.

Respectfully submitted,

*/s/ John H. Carney*
John H. Carney
Texas Bar No. 03832200
10541 Berry Knoll Drive
Dallas Texas 75230
214-549-0555
214-890-1155 fax
jhcblue@gmail.com

Charles W. McGarry
Texas Bar No. 13610650
LAW OFFICE OF CHARLES McGARRY
701 Commerce Street, Suite 400
Dallas, Texas  75202
(214) 748-0800
(214) 748-9449 fax

ATTORNEYS FOR PLAINTIFF

CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of this instrument was delivered to the following

counsel of record on this 9th day of August, 2017 in accordance with the Federal Rules of Civil

Procedure:


Anthony S. Cox
CNA COVERAGE LITIGATION GROUP
Texas Bar No. 04935000
700 N. Pearl Street, Suite 450
Dallas, TX 75201
Telephone: (214) 220-5910
Fax: (214) 220-5902
Email: anthony.cox@cna.com
ATTORNEY FOR DEFENDANTS CONTINENTAL CASUALTY COMPANY
AND CONTINENTAL INSURANCE COMPANY

George H. Arnold
Raymond M. Kutch
THOMPSON, COE, COUSINS & IRONS, L.L.P.
One Riverway, Suite 1400
Houston, TX 77056
Telephone: (713) 403-8210
Telecopy: (713) 403-8299
E-Mail: garnold@thompsoncoe.com
E-Mail: rkutch@thompsoncoe.com
ATTORNEYS FOR ZURICH AMERICAN INSURANCE COMPANY

Daniel D. McGuire
POLSINELLI PC
2950 N. Harwood, Suite 2100
Dallas, Texas 75201
Telephone: (214) 397-0030
Facsimile: (214) 397-0033
dmcguire@polsinelli.com

COUNSEL FOR DEFENDANT IMA, INC

*/s/ John H. Carney*
John H. Carney